**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

JANET M. GALM,

        Plaintiff,

vs.

EATON CORPORATION d/b/a EATON
CORPORATION LONG TERM
DISABILITY PLAN d/b/a EATON
BENEFITS CENTER,

        Defendant.

No. C04-4083-MWB

**MEMORANDUM OPINION AND
JUDGMENT REGARDING BRIEFS
ON THE MERITS**

---

**TABLE OF CONTENTS**

*I.*  *INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A.*  *Procedural Background*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B.*  *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II. LEGAL ANALYSIS*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   *A.*  *Review Of Benefits Determinations Under ERISA* . . . . . . . . . . . . . . . 16
       *1.*    *Deferential review* . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
           *a.*    *Review of plan interpretation*  . . . . . . . . . . . . . . . . 17
           *b.*    *Review of factual determinations* . . . . . . . . . . . . . . 18
           *c.*    *The deferential review applicable here*  . . . . . . . . . . 19
       *2.*    *"Less deferential" review* . . . . . . . . . . . . . . . . . . . . . . . 19
           *a.*    *When "less deferential" review is appropriate*  . . . . . 19
           *b.*    *Plaintiff's grounds for "less deferential" review* . . . . . 20
               *i.*    *Conflict of interest* . . . . . . . . . . . . . . . . . . . . 20
               *ii.*    *Social Security award* . . . . . . . . . . . . . . . . . . 22
               *iii.*    *Procedural irregularities.*  . . . . . . . . . . . . . . . 23
   *B.*  *Application Of The Substantial Evidence Test* . . . . . . . . . . . . . . . . 25

***III. CONCLUSION*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## *I.  INTRODUCTION AND BACKGROUND*

### *A.  Procedural Background*

On August 2, 2004, plaintiff Janet M. Galm filed a petition in Iowa District Court In And For Clay County against Eaton Corporation ("Eaton") under the civil enforcement provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), seeking long-term disability benefits under an employee welfare benefit plan ("the Plan") sponsored by her former employer, Eaton.  On August 26, 2004, defendant Eaton removed this case to this court  pursuant to 28 U.S.C. § 1441(a), alleging jurisdiction based on ERISA's express federal jurisdictional provision found in 28 U.S.C. § 1332(e).

In Galm's petition, she alleges  that Eaton denied her second-tier long-term disability benefits under the Plan, in violation of ERISA.  In its answer, Eaton admits denying Galm second-tier long-term disability benefits, but alleges the denial of these benefits was reasonable and not arbitrary or capricious.  Following the court's granting plaintiff Galm's request to conduct discovery, *see Galm v. Eaton Corp.*, 360 F. Supp. 2d 978,  984-986 (S.D. Iowa 2005), both parties have filed briefs on the merits centered on

the central issue in this case, whether plaintiff Galm is disabled under the terms of the Plan.

The court turns first to a discussion of the undisputed facts as shown by the record and the parties' submissions, then to consideration of the standards applicable to judicial review of benefits determinations under ERISA, and, finally, to the legal analysis of whether Eaton's decision to deny Galm second-tier long-term disability benefits was supported by substantial evidence.

## B. Factual Background

The record reveals that the following facts are undisputed. Plaintiff Janet M. Galm worked as an induction hardener/machinist for Eaton for almost thirteen years. As an Eaton employee, Galm participated in an employee welfare plan to provide long-term disability benefits to participants who became disabled and unable to work. The Plan, which is administered by Eaton, has a two-tier disability benefit structure. Under the first tier of the Plan, a participant has a covered disability if, during the first twenty-four months of her disability, the participant is unable to perform the duties of her occupation with Eaton. Under the second-tier, the definition of disability changes and the Plan provides that:

> during the continuation of such total disability following the first 24 months, you are totally and continuously unable to engage in any occupation or perform any work for compensation or profit from which you are, or may become, reasonably well fitted by reason of education, training or experience —at Eaton Corporation or elsewhere.

Record at 000014.

The Plan also reduces long term disability benefits by the amount of benefits

applicants are entitled to receive from other sources, including Social Security disability benefits:

> Remember that the maximum long term disability benefit is reduced by the amount of benefits you are eligible to receive from other sources. For example, the Claims Administrator will assume that you are receiving any Social Security benefits from which you and your dependents may be eligible because of your disability. Your long term disability benefit will be reduced by an estimate of the amount you are eligible to receive from Social Security **unless you submit satisfactory evidence that you applied for these benefits and your request was denied.** For this reason, it is important that you apply for any other benefits you are eligible to receive before you are eligible to receive long term disability benefits. You should apply to your local Social Security Administration office no later than the fourth month of disability to provide them with adequate time to process your request for Social Security Disability benefits. If the initial application for Social Security benefits is denied, the Plan requires you to reapply. In the event Social Security Disability benefits are denied upon re-application, the Plan requires you to appeal the denial before an Administrative Law Judge.

Record at 000021-22 (emphasis original).

Plaintiff Galm applied for and received six months of short term disability benefits under the Eaton short-term disability plan. On February 10, 2001, Galm became eligible for long term disability benefits under the first tier of the Plan and thereafter applied for and received benefits under the first tier of the Plan. Complying with the requirements of the Plan, Galm applied for Social Security disability benefits on April 24, 2001. Galm was determined to be disabled by the Social Security Administration and was awarded Social Security disability benefits on November 26, 2002. The Administrative Law Judge noted in his decision:

4

> The claimant cannot perform her past relevant work and does not have transferable skills to perform other work within her residual functional capacity. Given the claimant's residual functional capacity and the vocational factors of her age, education and past work experience, there are no jobs existing in significant numbers that the claimant is capable of performing. The claimant is under a disability as defined by the Social Security Act and Regulations.

Record at 00026.

After twenty-four months of receiving disability benefits under the Plan, Galm exhausted the long term disability benefits under the first tier of the Plan. Galm then applied for long term disability benefits under the second-tier of the Plan. Broadspire Services ("Broadspire"), formerly Kemper Insurance Companies, the Claims Administrator, determined that Galm was not eligible to receive benefits under the second-tier of the Plan and denied Galm further disability benefits under the Plan. Through counsel, Galm appealed the initial denial of benefits. With her notice of appeal, Galm included approximately 1200 pages of additional medical records to be considered in the first level of appeal. Broadspire subsequently denied Galm's appeal. Galm appealed Broadspire's First Level Appeal decision and submitted an additional 180 pages of medical records with her appeal.

The administrative record consists of 1686 pages and includes records from five hospitals and multiple physicians, including Galm's own treating physicians. The Plan grants Eaton, as Plan Administrator, full discretionary authority with respect to its decision making. The Plan's Summary Plan Description states in pertinent part:

> The Plan Administrator shall have discretionary authority to determine eligibility for benefits and to construe any and all terms of the Plan, including, but not limited to, any disputed or doubtful terms. The Plan Administrator shall also have the

> power and discretion to determine all questions of fact and law arising in connection with the administration, interpretation and application of the Plan.

Record at 000032.

Eaton, as Plan Administrator, in its final determination, concluded that Galm was not eligible for second-tier long term disability benefits under the Plan. In its final determination letter, Eaton explained that it had reviewed the entire Administrative Review Record and concluded that its rationale for its decision was grounded on its finding that:

> [T]he medical professionals who have reviewed the medical documentation provided by Ms. Galm cannot support the conclusion that Ms. Galm is disabled from any occupation. A review of all of the medical information does not reveal a clear determination by any treating physician that she has met the Plan's standard for disability from any occupation. Her Social Security award of disability benefits was determined under a different standard that is not dispositive of a disability determination under the terms of the LTD Plan. Eaton has full discretion to determine eligibility for Plan benefits that in this instance requires medical evidence to support a disability that prevents an individual from performing any occupation. Based upon these facts, Ms. Galm's final appeal for benefits under the Plan is denied.

Record at 001685.

In its final determination letter, Eaton indicated that all of Galm's medical records were reviewed and analyzed by an independent physician reviewer, who is a member of an independent third party review board.[1] The independent physician reviewer is board

---

[1]This was in keeping with the Plan, which provides:

> If the benefit denial was based in whole or in part on a medical

(continued…)

> power and discretion to determine all questions of fact and law arising in connection with the administration, interpretation and application of the Plan.

Record at 000032.

Eaton, as Plan Administrator, in its final determination, concluded that Galm was not eligible for second-tier long term disability benefits under the Plan. In its final determination letter, Eaton explained that it had reviewed the entire Administrative Review Record and concluded that its rationale for its decision was grounded on its finding that:

> [T]he medical professionals who have reviewed the medical documentation provided by Ms. Galm cannot support the conclusion that Ms. Galm is disabled from any occupation. A review of all of the medical information does not reveal a clear determination by any treating physician that she has met the Plan's standard for disability from any occupation. Her Social Security award of disability benefits was determined under a different standard that is not dispositive of a disability determination under the terms of the LTD Plan. Eaton has full discretion to determine eligibility for Plan benefits that in this instance requires medical evidence to support a disability that prevents an individual from performing any occupation. Based upon these facts, Ms. Galm's final appeal for benefits under the Plan is denied.

Record at 001685.

In its final determination letter, Eaton indicated that all of Galm's medical records were reviewed and analyzed by an independent physician reviewer, who is a member of an independent third party review board.[1] The independent physician reviewer is board

---

[1]This was in keeping with the Plan, which provides:

> If the benefit denial was based in whole or in part on a medical

(continued…)

certified in physical medicine and rehabilitation, a Diplomate of the American Academy of Physical Medicine and Rehabilitation, and a Diplomate of the American Board of Electrodiagnostic Medicine. The physician reviewer is also a member of the American Spinal Injury Association, a state academy of physical medicine and a stated medical society. The physician reviewer is licensed to practice medicine in four states and has been in practice since 1978.[2]

The physician reviewer addressed five distinct medical conditions of concern for Galm, concluding that she did not meet the criteria for disability under the second-tier of the Plan. First, with respect to Carpal Tunnel Syndrome, the physician reviewer noted that while Galm had been treated for mild Carpal Tunnel Syndrome and had carpel Tunnel release surgery, she had shown improvement after surgery and had made no complaints

---

[1](...continued)

> judgment, the appeals process will include consultation with a health care professional with training and experience in the relevant medical field. This health care professional may not have been involved in the denial decision, nor be a subordinate of the health care professional who was involved. If the Claims Administrator or the Plan Administrator has obtained or will obtain medical or vocational experts in connection with the Claim, these experts will be identified, regardless of whether their advice was relied upon by the Claims Administrator or the Plan Administrator in making any benefit determinations.

The Plan at 4, Record at 000037.

[2]The court notes that the name of the physician reviewer is not disclosed in the record. The physician's report here indicates that it is the general policy of the Medical Review Institute of America to keep the names of its physician reviewers confidential in all cases. Record at 001681.

with regard to her hand for five and one-half years. Moreover, during the time Galm did have postsurgical complaints, her complaints were not supported by objective findings. The physician reviewer concluded that: "[a]t most, this problem would only create work restriction of avoiding air power tools and frequent repetitive motions." Record at 001678. The reviewing physician next addressed Galm's cervical disc disease and noted that while Galm had undergone an anterior cervical fusion, postoperative notes from the surgeon indicated good healing and good results. Moreover, it was concluded that any postoperative pain complained of by Galm was from Fibromyalgia and that all of the exams done over the past few years were normal.[3] In addition, the physician reviewer noted that any mild restriction in the cervical range would not interfere with Galm's functionality. The physician reviewer next addressed Galm's Fibromyalgia, noting that while Galm had been diagnosed with Fibromyalgia for several years and reported numerous areas of tenderness, there were no abnormal findings and all of Galm's labs were normal. The physician reviewer noted that Galm had no widespread loss of joint movement and that her neuromusculoskeletal exams were all essentially normal. In addition, the physician reviewer pointed out that Galm's medical notes over the previous

---

[3]Fibromyalgia is defined as:

> A syndrome of chronic pain of musculoskeletal origin but uncertain cause. The American College of Rhuematology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least 11 of 18 specific sites.

STEDMAN'S MEDICAL DICTIONARY at 671 (27th ed. 2000).

year did not indicate any ongoing problem and that there was no ongoing documentation of myofascial pain or abnormal examination results. As a result, the physician reviewer concluded that Galm's Fibromyalgia did not create a permanent disability. The physician reviewer turned next to address Galm's other musculoskeletal complaints, noting that Galm had been diagnosed with Piriformis Syndrome at the Mayo Clinic and that she had had lateral epicondylitis, and hand injuries. The physician reviewer concluded that while these problems had been treated with various outcomes, there was no evidence that these conditions had been problems for Galm in the previous year. The physician reviewer thus concluded that these conditions did not establish any restrictions or disability on the part of Galm.

The physician reviewer finally addressed Galm's history of migraine headaches, noting that this appeared to be Galm's major ongoing problem. The physician reviewer observed that medical notes on Galm going back to 1989 indicated that she suffered from headaches even then. He further pointed out that Galm had been evaluated at the Mayo Clinic and by another neurologist with a diagnosis of migraine. However, all of Galm's examinations were normal and no structural reason was found for her headaches. The physician reviewer observed that Galm had not followed up with a behavioral program that had been recommended. He further observed that Galm's visits to a clinic and two hospitals were becoming quite frequent and that Galm was getting more narcotic injections as treatment for her headaches. As a result, the physician reviewer concluded that Galm might be dependent on the narcotics and, if so, Galm's behavioral problems, sleep problems, and headaches might all be related to narcotic usage. Thus, the physician reviewer summarized his conclusions as follows:

> In summary, over the last year, the only ongoing problems documented are headaches and sleeplessness. During this time

9

there have been ever increasing trips to multiple sites for parenteral injections. No abnormal findings on exam are documented during these multiple visits. Although the patient complained of nausea, there is no documentation to support this. Cognitive function is intact. No documentation of ongoing problems form [sic] her other problematic areas. Therefore, the documentation only describes a person being sen [sic] repeatedly for drug injections with the only subjective or objective findings being her complaint of recurrent headaches. Therefore, there are no findings upon which restrictions and permanent disability can be based.

Record at 001680.

In addition to the independent physician reviewer, comprehensive peer reviews were conducted by Dr. Sheldon Zane, a rheumatologist, Dr. Vaughn D. Cohan, a neurologist, Dr. Barry M. Glassman, a psychiatrist, Dr. Dennis Mazal, an internal medicine specialist, and Dr. Lawrence Burstein, a psychologist. Dr. Zane reviewed all of the medical evidence in the administrative record and concluded that from a rheumatological standpoint, "there is not enough documentation that would preclude her from working at any occupation." Record at 001628. Dr. Zane further opined:

With all of the above taken into consideration, it is my opinion that Ms. Galm can perform at a sedentary occupation if certain conditions can be met. These include ergonomic equipment, reasonable rest periods, the ability to change positions and be able to get up and stretch, not having to lift/carry objects more than 10 lbs and not having to walk or stand for excessive periods of time. She may begin such employment in a gradual fashion, working up to an 8-hour day.

Record at 001628.

Dr. Cohan first addressed Galm's history of Carpal Tunnel Syndrome, noting her surgery and follow up treatments resulted in satisfactory results. He concluded that "in

the absence of significant sensory or motor impairment, Carpal Tunnel Syndrome would not be disabling with respect to 'any occupation.'" Record at 001634. Dr. Cohan also addressed Galm's history of migraine headaches, noting that while Galm had been evaluated neurologically, she had never been treated on an ongoing basis by a neurologist or other specialist in headache management but instead had been treated by her primary physicians and emergency room physicians. He further pointed out that as a result of Galm's demanding use of analgesic agents as her program of therapy, she "no doubt has become analgesic dependent." Record at 001635. Dr. Cohan concluded that:

> Imaging studies have revealed no intracranial pathology which would be consistent with headache other than the abnormal white matter findings which are often seen in migraine patients. However, there is no associated impaired neurologic functionality associated with that. Finally, there is no objective evidence that the claimant's chronic headache disorder represents a functional impairment which would preclude her from performing "any occupation" on a full time basis.

Record at 001635. Dr. Cohan next addressed Galm's diagnosis of Fibromyalgia and concluded that, from a neurologic standpoint, Galm's diagnosis of Fibromyalgia was not confirmable because orthopedic, rheumatological, and neurological physical examination findings had "been uniformly normal with exception of restricted cervical range of motion as expected postoperatively." Record at 001635. Dr. Cohan went on to conclude that "[w]hether the claimant does or does not fit the criteria for a diagnosis of Fibromyalgia, there is no demonstrable objective evidence of a functional impairment which would preclude her from performing the essential elements of 'any occupation.'" Record at 001635. Dr. Cohan also addressed Galm's history of musculoskeletal pain, concluding that:

> [T]here is no objective evidence of a neurologic or orthopedic functional impairment based on disease of the cervical, thoracic or lumbosacral spine which would preclude the claimant from performing "any occupation." There is no demonstrable evidence by examination or by functional capacity evaluation that the claimant has significantly restricted endurance for sitting, standing and/or walking, despite her complaints to the contrary. Also, there is no demonstrable evidence of significant functional impairment with respect to cognition, speech, or use of upper extremities.

Record at 001637.

Dr. Glassman, a psychiatrist, concluded from his review of the administrative record that:

> The medical record does not support a psychiatric illness of an incapacitating nature. The claimant has not been under formal psychiatric or psychological treatment for the diagnosis of depression. Evaluation performed in the Mayo Clinic, December 2000 made a diagnosis of major depressive disorder. The diagnosis itself does not note incapacity and there is no supporting documentation that describes functional impairments that would indicate incapacity.

Record at 001642.

Dr. Burstein, a psychologist, reached a similar conclusion from his review of the documentation provided to him, that this documentation did not show evidence of a functional impairment which would preclude Galm from working:

> [T]he documentation provided for review does not show evidence of impairments in psychological functioning which would preclude Ms. Galm from performing work. As indicated, Ms. Galm has not sought out formal psychological or psychiatric treatment. While she did have a consultation with a psychiatrist and a psychologist, these consultations were part of a complete physical workup rather than as part of an

intention to receive treatment for her depressive symptoms. The depression itself is typically described as being secondary to the effects of her chronic pain. The mental health providers at the Mayo Clinic, in December 2000, did believe her symptoms warranted a diagnosis of major depression but there were no reports of impairments in cognitive functioning or other symptoms that would preclude Ms. Galm from working, from a psychological perspective. Ms. Galm is estimated to have a GAF of 65, which suggests mild symptoms that are likely to be transient in nature and are unlikely to preclude an individual from being able to perform work.

Record at 001359.

Dr. Mazal, an internal medicine specialist, concluded that his review of the documentation provided to him did not show evidence of a functional impairment which would preclude Galm from working. In his report, Dr. Mazal wrote:

[T]he documentation provided for review does not show evidence of a functional impairment that would preclude work based upon the diagnosis of migraine syndrome and Fibromyalgia. Specifically, there is no objective evidence in the medical records for any significant impairment of the musculoskeletal system or the neurological system. Although it is well documented in the records that the claimant suffers from a decreased range of motion of the cervical and thoracic spine, there is no objective evidence of any significant impairment of reflexes or motor strength. Her gait is described as normal. Although the claimant does have migraine headaches which she claims are associated with nausea and vomiting, there is no objective evidence in the majority of emergency room or clinic visits to indicate that she was observed to be vomiting, nor is there any objective evidence of dehydration or a significant electrolyte abnormality to support the premise. It is unclear from these records whether or not the claimant has migraine syndrome alone, or is concomitantly experiencing rebound headaches complicated

13

by depression and/or narcotic dependence.

Record at 001354. Thus, four peer review physicians and the one peer review psychologist all concluded that Galm was not disabled under the "any occupation" requirement of the Plan.

On April 20, 2001, Rick Ostrander, a vocational expert, administered a vocational rehabilitation evaluation on Galm, apparently done in order to buttress her claim for Social Security Disability Benefits, and concluded that: "Janet Galm is not employable in any capacity on a regular basis. Her limitations and restrictions from work are so severe as to preclude any type of regular gainful employment." Record at 000115. Ostrander evaluated Galm again on September 21, 2001, in order to address vocational issues as they related to Galm's claim for Social Security Disability Benefits. Ostrander concluded:

> There is no work existing in significant numbers in the region or national economy that will allow Janet Galm to earn at least $740.00 per month. She has been essentially limited to work that allows her to vary her sitting and standing and avoid repetitive activity and twisting and turning, which would be a very restricted range of light and sedentary work. Additionally, she has been restricted to 4 hours of work per day. Given her lack of transferable skills, Janet would reasonably be regulated to unskilled, entry level work on a part-time basis, which fits within her physical restrictions. There is no work in existence that would allow her to be employed in this capacity and earn at or above $740.00 per month.

Record at 000195.

Ostrander conducted a follow up with Galm on October 14, 2002 and issued a report on October 18, 2002, in which he found:

> Given this medical history and frequency of treatment for debilitating migraine headaches, it is my opinion that Janet

14

> Galm is not employable in any capacity on a regular basis and certainly is unable to earn $740.00 per month to perform substantial gainful work activity. Based on my review of the medical records and my understanding of Janet's physical limitations, assuming those to be accurate, she is unable to work since her last employment at Eaton Corporation.

Record at 000197.

As noted above, the administrative record also includes medical records and opinions from Galm's treating physicians. On June 17, 2002, Dr. Nathan A. Meyer wrote in a letter:

> I have seen Janet Galm for chronic migraine headaches and Fibromyalgia. Due to these debilitating diseases, she is unable to have gainful employment at this time.

Record at 000198. Dr. Meyer wrote a second letter on Galm's behalf on October 3, 2002, in which he stated:

> This is a letter regarding Janet Galm and her disability status. She has had an extensive medical history of debilitating migraine headaches, status cervical fusion and has bilateral Carpal Tunnel Syndrome as well as debilitating Fibromyalgia and depression. She has been on a plethora of medications for this, none of which have been able to control her symptoms of pain and weakness,
>
> As you well know she was deemed disabled by you previously. I would note at this point that her medical condition has not changed the state she was in when evaluated by Forslund and Barthel and deemed disabled. Due to this unchanged medical status I would anticipate that her disability status would remain unchanged. It is my opinion at this point that based on a reasonable degree of medical probability her medical status will not change in the near future.

Record at 000199.

## II. LEGAL ANALYSIS

### A. Review Of Benefits Determinations Under ERISA

The Eighth Circuit Court of Appeals has summarized the standard ordinarily applicable to a court's review of a fiduciary's benefits determination under ERISA as follows:

> "ERISA provides a plan beneficiary with the right to judicial review of a benefits determination." *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998); *see* 29 U.S.C. § 1132(a). It is undisputed that the Toro Plan gives the administrator discretionary authority to determine eligibility for benefits, so we would ordinarily review the administrator's decision for abuse of discretion. *See Woo*, 144 F.3d at 1160. "This deferential standard reflects our general hesitancy to interfere with the administration of a benefits plan." *Layes v. Mead Corp.*, 132 F.3d 1246, 1250 (8th Cir. 1998). Under such standard, a reviewing court should consider only the evidence before the plan administrator when the claim was denied. *Id.* at 1251.

*Heaser v. Toro Co.*, 247 F.3d 826, 833 (8th Cir. 2001).

The parties here agree that, as in *Heaser*, the Plan gives Eaton discretionary authority to determine eligibility for benefits, so that the court would ordinarily review Eaton's decision finding Galm ineligible for second-tier long term disability benefits under the Plan for abuse of discretion. *Id.* The court therefore begins its legal analysis with consideration of the deferential "abuse of discretion" standard of review "ordinarily" applicable to a plan administrator's discretionary denial of benefits. *See Heaser*, 247 F.3d at 833.

### 1. Deferential review

Under the deferential "abuse of discretion" standard of review, "an administrator's decision to deny benefits will stand if reasonable." *Farley v. Arkansas Blue Cross & Blue Shield*, 147 F.3d 774, 777 (8th Cir. 1998).[4] However, as the Eighth Circuit Court of Appeals has also explained, the nature of the review for "reasonableness" depends upon the basis on which the plan administrator denied the claim for benefits. *See Donaho v. FMC Corp.*, 74 F.3d 894, 898-900 (8th Cir. 1996); *see also Farley*, 147 F.3d at 777 & n.6 (citing *Donaho*).

### a. Review of plan interpretation

"When determining whether an administrator's interpretation of a plan is reasonable, [courts in this circuit] apply a five-factor test." *Farley*, 147 F.3d at 777 n.6 (citing *Finley v. Special Agents Mut. Benefit Ass'n, Inc.*, 957 F.2d 617, 621 (8th Cir. 1992)); *Donaho*, 74 F.3d at 899 n.9 (same, also citing *Finley*). That five-factor test, as explained in *Finley v. Special Agents Mutual Benefit Association, Inc.*, 957 F.2d 617 (8th Cir. 1992), consists of the following:

> In determining whether the [plan administrator's] interpretation of [disputed terms] and decision to deny the [claimed] benefits are reasonable, [courts] consider [1] whether [the plan administrator's] interpretation is consistent with the goals of the Plan, [2] whether [the plan administrator's] interpretation renders any language in the Plan meaningless or internally inconsistent, [3] whether [the plan administrator's] interpretation conflicts with the substantive or procedural requirements of the ERISA statute, [4] whether [the plan

---

[4]The Eighth Circuit Court of Appeals has explained that "abuse of discretion," "arbitrary and capricious," and "reasonableness" are synonymous in the context of review of denial of claims under ERISA. *See Donaho v. FMC Corp.*, 74 F.3d 894, 898-900 (8th Cir. 1996).

administrator] ha[s] interpreted the words at issue consistently, and [5] whether [the plan administrator's] interpretation is contrary to the clear language of the Plan. *See De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1188 (4th Cir. 1989) (citing cases).

*Finley*, 957 F.2d at 621.

### b. Review of factual determinations

However, when the court is "asked to review the administrator's evaluation of the facts to determine the application of the Plan . . . the five-factor test is not instructive." *Farley*, 147 F.3d at 777 n.6 (citing *Donaho*, 74 F.3d at 899-900 n.9). Instead, in such circumstances, "[i]n determining reasonableness, [courts of this circuit] focus on whether the decision is supported by substantial evidence." *Id.* at 777 (citing *Donaho*, 74 F.3d at 900); *Donaho*, 74 F.3d at 900 (concluding that "'substantial evidence' is only a quantified reformulation of reasonableness" in cases involving the plan administrator's evaluation of the facts to determine plan application). "Substantial evidence" is "'more than a scintilla but less than a preponderance.'" *Woo*, 144 F.3d at 1162 (quoting *Donaho*, 74 F.3d at 900 n.10).

As to the process to determine whether the administrator's determination is supported by "substantial evidence," "[courts] consider only the evidence that was before the administrator when the claim was denied." *Farley*, 147 F.3d at 777 (citing *Brown v. Seitz Foods, Inc., Disability Benefit Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998)). However, courts do not "substitute [their] own weighing of the evidence for that of the administrator." *Id.* (citing *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997)). Despite this deference to the plan administrator's weighing of the evidence, "[t]he unreasonableness of a plan administrator's decision can be determined by both the quantity and quality of the evidence supporting it." *Donaho*, 74 F.3d at 900.

### c.    The deferential review applicable here

Because the "reasonableness" of Eaton's decision to find Galm ineligible for second-tier long-term disability benefits in this case is contested only on the basis of the "reasonableness" of Eaton's evaluation of the facts to determine whether Galm continued to meet the Plan's definition of disabled, i.e. whether she was disabled from engaging in "any occupation", the court must conduct a "substantial evidence" analysis of Eaton's factual finding that Galm was not disabled. However, before performing this "ordinary" deferential review, *see Heaser*, 247 F.3d at 833, the court must also take up Galm's contention that "less deferential" review is appropriate in this case.

## 2.    "Less deferential" review

### a.    When "less deferential" review is appropriate

Although courts must "ordinarily review the administrator's decision for abuse of discretion," *see Heaser*, 247 F.3d at 833, as the Eighth Circuit Court of Appeals also explained in *Heaser*, an administrator's denial of benefits is not *always* entitled to that sort of "deferential" review:

> A plaintiff may obtain less deferential review by presenting "material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her." *Woo*, 144 F.3d at 1160. An alleged conflict or procedural irregularity must have some connection to the substantive decision reached. *Id.* at 1161. A claimant must offer evidence that "gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim" for us to apply the less deferential standard. *Layes*, 132 F.3d at 1250 (internal quotation marks omitted).

*Heaser*, 247 F.3d at 833; *accord Parkman v. Prudential Ins. Co.*, 439 F.3d 767, 772 n.5

(8th Cir. 2006). Thus, when faced with a contention that less deferential review is appropriate, the court must decide whether the claimant has "offer[ed] evidence that 'gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim.'" *Heaser*, 247 F.3d at 833 (quoting *Layes*, 132 F.3d at 1250). There are two steps in that process: The court must first decide whether the claimant has presented "'material, probative evidence demonstrating that . . . a palpable conflict of interest or a serious procedural irregularity existed,'" then determine whether that conflict or irregularity "'caused a serious breach of the plan administrator's fiduciary duty to her.'" *Id.* (quoting *Woo*, 144 F.3d at 1160); *accord Parkman*, 439 F.3d at 772 n.5

If the claimant has persuaded the court that there is a conflict of interest or procedural irregularity that caused a breach of the administrator's fiduciary duty, such that "less deferential" review is appropriate, the court must decide what "proportion" of deference should be given the plan administrator's determination in light of the conflict of interest or procedural irregularities. *See Woo*, 144 F.3d at 1161-62. For example, in *Woo*, after finding a conflict and irregularities that "had a sufficient connection to the decision reached to trigger a less deferential review," the court decided that the conflict and irregularities were so "egregious" that the court would "require that the record contain substantial evidence bordering on a preponderance to uphold [the administrator's] decision" to deny benefits on factual grounds. *Id.* at 1162.

### b. Plaintiff's grounds for "less deferential" review

**i.** **Conflict of interest**. Galm argues that "less deferential" review is appropriate here, because Eaton had a conflict of interest as both insurer and plan administrator for the Plan. She argues that, as a profit-making company, Eaton had a financial interest in disallowing her claim for second-tier disability benefits under the Plan.

The Eighth Circuit Court of Appeals has recognized that when the insurer is also the

plan administrator, "something akin to a rebuttable presumption of a palpable conflict of interest" exists. *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 947-48 (8th Cir. 2000); *see Farfalla v. Mutual of Omaha Ins. Co.*, 324 F.3d 971, 973 (8th Cir. 2003); *Phillips-Foster v. UNUM Life Ins. Co.*, 302 F.3d 785, 795 (8th Cir. 2002). "Indicia of bias can be negated by 'ameliorating circumstances' such as 'equally compelling long-term business concerns' that militate against improperly denying benefits despite the dual role." *Schatz*, 220 F.3d at 948 ( citing *Barnhart v. UNUM Life Ins. Co.*, 179 F.3d 583, 588 (8th Cir. 1999). The Eighth Circuit Court of Appeals has further noted that "[n]ot every funding conflict of interest, however, warrants heightened review because ERISA itself contemplates the use of fiduciaries who might not be entirely neutral." *Tillery v. Hoffman Enclosures, Inc.*, 280 F.3d 1192, 1197 (8th Cir. 2002) (citation omitted). *see Davolt v. The Executive Comm. of O'Reilly Auto.*, 206 F.3d 806, 809-10 (8th Cir. 2000) (holding the district court erred by finding an automatic conflict of interest merely because insurer and administrator were the same). The Eighth Circuit Court of Appeals has further indicated that "it is wrong to assume a financial conflict of interest from the fact that a plan administrator is also the insurer." *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1030 (8th Cir. 2000); *see Davolt v. The Executive Comm. of O'Reilly Auto.*, 206 F.3d 806, 809-10 (8th Cir. 2000) (holding the district court erred by finding an automatic conflict of interest merely because insurer and administrator were the same).

It is unclear under Eighth Circuit law whether the plaintiff has the burden of producing actual evidence of a financial conflict, or whether the defendant, after the plaintiff has alleged that the defendant is both the insurer and the administrator, has the burden of producing evidence to rebut the presumption of a conflict of interest. *Compare McGarrah*, 234 F.3d at 1030, with *Schatz*, 220 F.3d at 947-48, *Phillips-Foster*, 302 F.3d at 795, and *Torres v. UNUM Life Ins. Co.*, 405 F.3d 670, 678 (8th Cir. 2005). Here,

21

plaintiff Galm has made the bare allegation of a financial conflict based on Eaton's dual role as both insurer and administrator, but has produced no evidence that this dual role influenced Eaton's decision to disallow her claim for second-tier disability benefits under the Plan. Thus, on the record before it, the court cannot conclude that defendant Eaton's dual role influenced its decision in this case or created a palpable conflict of interest. Eaton's consideration of extensive medical evidence in making its decision as to whether Galm was eligible for second-tier long term disability benefits as well as Eaton's decision to obtain reviews by Dr. Zane, Dr. Cohan, Dr. Burstein, Dr. Glassman, and Dr. Mazal, in addition to the review undertaken by the independent physician reviewer, before making its decision, dissipate the allegations of a conflict of interest.

   *ii.*    ***Social Security award***. The court is also unpersuaded by Galm's argument that since she was awarded Social Security disability benefits but was denied second-tier disability benefits by Eaton, the court must apply the "less deferential" review here. The flaw in Galm's argument here is that an ERISA plan administrator or fiduciary "generally is not bound by a SSA determination that a plan participant is 'disabled.'" *Jackson v. Metropolitan Life Ins. Co.*, 303 F.3d 884, 889 (8th Cir. 2002) (citing *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 950 n.9 (8th Cir .2000)). A case, such as this, which involves the denial of long term disability benefits, yet also the award of Social Security benefits, "appears to be the product of discretionary judgment applied to a record containing conflicting evidence as well as the result of the somewhat different standards governing social security and the ERISA determinations." *Schatz*, 220 F.3d at 949 n.9 (citing *Conley v. Pitney Bowes*, 176 F.3d 1044, 1049-50 (8th Cir. 1999) (holding that elaborate schemes mandated by the Social Security Administration in the context of evaluating a claimant's subjective complaints of pain and fitness for particular jobs need not be "import[ed] wholesale, into what is essentially a private-law area"), *cert. denied*, 528

U.S. 1136 (2000)). This is particularly appropriate here where the Social Security Administration's definition of "disabled" is not as restrictive as that contained in the Plan. Moreover, the record before the Social Security Administration is not identical to that which was before Eaton. Therefore, even if the definition of disabled was the same under both the Plan and Social Security, variations in the record could explain contrary results. Thus, the court concludes that plaintiff Galm is not entitled to have her claim reviewed under the less deferential standard of review merely because she was awarded Social Security disability benefits.

*iii.* ***Procedural irregularities.*** In determining whether "procedural irregularities" occurred, the court is to consider whether the plan administrator's decision "'was made without reflection or judgment, such that it was the product of an arbitrary decision or the plan administrator's whim.'" *Parkman*, 439 F.3d at 772 n.5 (quoting *Pralutsky*, 435 F.3d 833, 838 (8th Cir. 2006) (quotation and citation omitted)). Here, plaintiff Galm contends that Eaton engaged in procedural irregularities in denying her second-tier long term disability benefits. Specifically, Galm argues that because the Plan Administrator did not read all of the medical records in the administrative file in making his decision regarding Galm's eligibility for second-tier disability benefits that the less deferential standard of review is applicable. A review of the record, however, reveals that Galm's characterization of what transpired during Eaton's review of her claim is misleading.

James Hrivnak, Senior Manager of health and Welfare Benefits at Eaton, did admit that he did not read all of Galm's medical records. Record at 001722. Hrivnak, however, went on to explain that he did not do so because he was "not a clinician." Record at 001722. Rather, Hrivnak explained that Eaton relies on third party medical reviewers to provide objective medical assessments and opinions and that Eaton ensures that this process is followed:

> The review that our group would do in Cleveland would vary
> by case. Each case is independent and unique. The primary
> things we look for is that Broadspire (sic) or Kemper has
> completed their process, whether that included independent
> medical exams, third-party reviews and/or send it to their
> medical directors for review. And then in our case, we ensure
> that complete information gets to our third-party independent
> review organization. So our major goal is to ensure that there
> is an appropriate process in place.

Record at 001723.

The court notes that it is uncontested that the administrative record in this case was reviewed by four peer review physicians and a psychologist, in addition to the independent physician reviewer. It was only after these medical experts had reviewed the administrative record and issued their written opinions regarding Galm that Eaton made its final determination regarding Galm's eligibility for second-tier disability benefits. Thus, the court concludes that plaintiff Galm has failed to show a nexus between Hrivnak's failure to read all of the medical records in her administrative file and a serious breach of the plan administrator's fiduciary duty to her. *Woo*, 144 F.3d at 1160.

Plaintiff Galm also asserts that the less deferential standard of review is appropriate here because Kemper was involved in the initial benefit determination and the first level appeal decision. Plaintiff Galm asserts that Kemper was unauthorized to make these determinations and therefore the court must review Eaton's denial of benefits under the de novo standard. The flaw in this argument is that the Plan specifically describes Kemper as the "Claims Administrator" for the Plan. Record at 000034. The Plan states that: "Eaton Corporation has retained Kemper to process and review disability claims and to rule on first level appeals from denials of claims." Record at 000034. The Plan goes on to identify Eaton as the Plan Administrator and gives Eaton the authority to make final benefit

determinations under the Plan.  Record at 000032-34.  Thus, Galm has not established an irregularity by virtue of the fact that Kemper issued the initial benefits determination and the first level appeal determination.   Nor has Galm established that Eaton rubber stamps Kemper's decisions.  Before ruling on Galm's appeal, Eaton obtained a separate and independent medical review of the administrative record in this case.  Record at 001673-001681.  It was only after obtaining this independent medical review that Eaton made its final decision regarding Galm's claim for second-tier disability benefits under the Plan. Thus, the court concludes that plaintiff Galm is not entitled to have her claim reviewed under the less deferential standard of review.

### B.  *Application Of The Substantial Evidence Test*

Because deferential "abuse of discretion" review is applicable here, the question the court must address on summary judgment is whether Eaton abused its discretion.  Here, Eaton's determination to deny Galm second-tier long term disability benefits under the Plan turns on a factual determination, namely whether Galm was "totally and continuously unable to engage in any occupation or perform any work for compensation or profit for which you are, or may become, reasonably well fitted by reason of education, training, or experience . . .", the Plan's definition of disability for second-tier long term disability benefits, at the time Eaton decided to deny such benefits.

Eaton correctly asserts that it is entitled to rely on the opinions of the independent physician reviewer and the peer review physicians and psychologist, Dr. Zane, Dr. Cohan, Dr. Burstein, Dr. Glassman, and Dr. Mazal, who gave contrary opinions to that of Galm's treating physician, Dr. Meyer, because the "treating physician rule", under which the opinions of treating physicians must be accorded special weight, does not apply to disability benefit determinations under plans governed by ERISA.  *See Black & Decker Disability*

*Plan v. Nord*, 538 U.S. 822, 825 (2003); see also *Hunt v. Metropolitan Life Ins. Co.*, 425 F.3d 489, 491 (8th Cir. 2005). In addition, Eaton is correct in its assertion that because the record reflects conflicting medical opinions, "'the plan administrator does not abuse his discretion in finding that the employee is not disabled.'" *Smith v. Unum Life Ins.*, 305 F.3d 789, 796 (8th Cir. 2002) (quoting *Donaho*, 74 F.3d at 901).

Here, the administrative record reflects that the only physicians to directly address Galm's medical conditions under the Plan's "any occupation" standard all concluded that the documentation provided for review did not show evidence of a functional impairment on the part of Galm which would prevent her return to work. First, the independent physician reviewer, after addressing five distinct medical conditions of concern for Galm, concluded that she did not meet the criteria for disability under the second-tier of the Plan:

> In summary, over the last year, the only ongoing problems documented are headaches and sleeplessness. During this time there have been ever increasing trips to multiple sites for parenteral injections. No abnormal findings on exam are documented during these multiple visits. Although the patient complained of nausea, there is not documentation to support this. Cognitive function is intact. No documentation of ongoing problems form [sic] her other problematic areas. Therefore, the documentation only describes a person being sen [sic] repeatedly for drug injections with the only subjective or objective findings being her complaint of recurrent headaches. Therefore, there are no findings upon which restrictions and permanent disability can be based.

Record at 001680.

Second, Dr. Zane, a rheumatologist, after reviewing all of the medical evidence in the administrative record, concluded that from a rheumatological standpoint, "there is not enough documentation that would preclude her from working at any occupation." Record at 001628. Dr. Zane was of the opinion that:

26

> With all of the above taken into consideration, it is my opinion that Ms. Galm can perform at a sedentary occupation if certain conditions can be met. These include ergonomic equipment, reasonable rest periods, the ability to change positions and be able to get up and stretch, not having to lift/carry objects more than 10 lbs and not having to walk or stand for excessive periods of time. She may begin such employment in a gradual fashion, working up to an 8-hour day.

Record at 001628.

Third, Dr. Cohan, a neurologist, in addressing Galm's history of Carpal Tunnel Syndrome, concluded that "in the absence of significant sensory or motor impairment, Carpal Tunnel Syndrome would not be disabling with respect to 'any occupation.'" Record at 001634. Dr. Cohan also addressed Galm's history of migraine headaches, concluding that:

> Imaging studies have revealed no intracranial pathology which would be consistent with headache other than the abnormal white matter findings which are often seen in migraine patients. However, there is no associated impaired neurologic functionality associated with that. Finally, there is no objective evidence that the claimant's chronic headache disorder represents a functional impairment which would preclude her from performing "any occupation" on a full time basis.

Record at 001635. Dr. Cohan also addressed Galm's diagnosis of Fibromyalgia and concluded that "[w]hether the claimant does or does not fit the criteria for a diagnosis of Fibromyalgia, there is no demonstrable objective evidence of a functional impairment which would preclude her from performing the essential elements of 'any occupation.'" Record at 001635. Dr. Cohan also addressed Galm's history of musculoskeletal pain, concluding that:

> [T]here is no objective evidence of a neurologic or orthopedic functional impairment based on disease of the cervical, thoracic

27

or lumbosacral spine which would preclude the claimant from performing "any occupation." There is no demonstrable evidence by examination or by functional capacity evaluation that the claimant has significantly restricted endurance for sitting, standing and/or walking, despite her complaints to the contrary. Also, there is no demonstrable evidence of significant functional impairment with respect to cognition, speech, or use of upper extremities.

Record at 001637.

Fourth, Dr. Glassman, a psychiatrist, concluded from his review of the administrative record that:

The medical record does not support a psychiatric illness of an incapacitating nature. The claimant has not been under formal psychiatric or psychological treatment for the diagnosis of depression. Evaluation performed in the Mayo Clinic, December 2000 made a diagnosis of major depressive disorder. The diagnosis itself does not note incapacity and there is no supporting documentation that describes functional impairments that would indicate incapacity.

Record at 001642.

Fifth, Dr. Burstein, a psychologist, concluded from his review of Galm's medical records that this documentation did not show evidence of a functional impairment which would preclude Galm from working:

[T]he documentation provided for review does not show evidence of impairments in psychological functioning which would preclude Ms. Galm from performing work. As indicated, Ms. Galm has not sought out formal psychological or psychiatric treatment. While she did have a consultation with a psychiatrist and a psychologist, these consultations were part of a complete physical workup rather than as part of an intention to receive treatment for her depressive symptoms. The depression itself is typically described as being secondary

to the effects of her chronic pain. The mental health providers at the Mayo Clinic, in December 2000, did believe her symptoms warranted a diagnosis of major depression but there were no reports of impairments in cognitive functioning or other symptoms that would preclude Ms. Galm from working, from a psychological perspective. Ms. Galm is estimated to have a GAF of 65, which suggests mild symptoms that are likely to be transient in nature and are unlikely to preclude an individual from being able to perform work.

Record at 001359.

Finally, Dr. Mazal, an internal medicine specialist, concluded that his review of Galm's medical record indicated that Galm did not show evidence of a functional impairment which would preclude her from working:

[T]he documentation provided for review does not show evidence of a functional impairment that would preclude work based upon the diagnosis of migraine syndrome and Fibromyalgia. Specifically, there is no objective evidence in the medical records for any significant impairment of the musculoskeletal system or the neurological system. Although it is well documented in the records that the claimant suffers from a decreased range of motion of the cervical and thoracic spine, there is no objective evidence of any significant impairment of reflexes or motor strength. Her gait is described as normal. Although the claimant does have migraine headaches which she claims are associated with nausea and vomiting, there is no objective evidence in the majority of emergency room or clinic visits to indicate that she was observed to be vomiting, nor is there any objective evidence of dehydration or a significant electrolyte abnormality to support the premise. It is unclear from these records whether or not the claimant has migraine syndrome alone, or is concomitantly experiencing rebound headaches complicated by depression and/or narcotic dependence.

Record at 001354.

Given these five physicians and one psychologist were in unanimity in their conclusion that Galm was not disabled under the "any occupation" requirement of the Plan, it is the opinion of this court that, based upon the record before the plan administrator, Eaton did not abuse its discretion in determining that Galm was not disabled under the terms of the Plan for second-tier long term disability benefits. This court is satisfied that based upon the record before the plan administrator that the plan administrator's decision was supported by substantial evidence and was thus reasonable. *See Jackson*, 303 F.3d at 887 (stating that a "decision is reasonable if a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision"). Therefore, the court concludes that Eaton is entitled to judgment in its favor on Galm's claim under ERISA.

### III. CONCLUSION

The court concludes that, as a matter of law, on the record here, Eaton's decision to deny Galm second-tier long term disability benefits is supported by substantial evidence. Therefore, the court finds that Eaton is entitled to judgment in its favor on Galm's claim under ERISA. The denial of second- tier long term disability benefits was not an abuse of discretion as a matter of law, because Eaton's interpretation of the Plan was not unreasonable and there was substantial evidence supporting Eaton's determination that Galm was not "disabled" within the meaning of the Plan.

\

**IT IS SO ORDERED.**

**DATED** this 3rd day of November, 2006.

_Mark W. Bennett_

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA